UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE, a minor suing under a fictitious name,<br><br>Plaintiff,<br><br>-against-<br><br>JENNIFER WHITCOMB and DEERFIELD ACADEMY,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES CAUSED BY BREACH OF CONTRACT, NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENT RETENTION OF AN EMPLOYEE DOING HARM TO A VULNERABLE STUDENT, AND FOR INJUNCTIVE RELIEF UNDER THE AMERICANS WITH DISABILITIES ACT**<br><br>**A JURY TRIAL IS DEMANDED IN RELATION TO ALL ISSUES SO TRIABLE** |

Plaintiff Jane Doe, a minor suing under a fictious name to protect her privacy ("Plaintiff"), for her Complaint against Jennifer Whitcomb ("Whitcomb") and Deerfield Academy ("Deerfield") states as follows:

**Introduction**

1. This case involves the betrayal of the trust of Plaintiff, a young and vulnerable student, by Deerfield Academy and Jennifer Whitcomb, the head of its Dance Program and with the aid of other Deerfield Staff. Well knowing that Plaintiff suffered a mental disability and that she had trusted Defendants Whitcomb, Deerfield, and others of its staff to accommodate her, they refused to do so, broke their promises to her, held her up for ridicule to her peers and family, breached her privacy, and humiliated her. As a result, they caused her disability to seriously aggravate to the point where she was and remains in dysfunctional anxiety and suffering from post-traumatic stress disorder and mental turmoil. She remains so incapacitated

that, although she tried, she was unable to continue with her studies and has had to leave Deerfield for two remaining trimesters of her junior year for care and treatment.

2. Plaintiff is a highly talented and dedicated young women who came to Deerfield in 2019, far from her home in Northern California, because, as Deerfield well knew because she and her mother told them, she could participate in Deerfield's highly self-promoted dance program to further train and perfect her dancing skills for use in college and beyond.

3. As Plaintiff told Deerfield, dance was "her life and her dream" and what she had devoted her childhood to learning and perfecting while sacrificing many of the other activities that young people her age enjoyed. She enrolled at Deerfield to pursue that dream.

4. By the time she concluded her sophomore year at Deerfield, in the summer of 2021, she had established herself as Deerfield's most talented dancer by far. As a result, Whitcomb, the head Deerfield's dance program, appointed her to perform as the Sugar Plum Fairy (including the famous "Dance of the Sugar Plum Fairy"), the lead role in *The Nutcracker*, which was to be the school's major production in the coming academic year. Her performance of this technically challenging choreography was planned by her to be the demonstration piece she would video for use in her college applications by which she sought to emphasize her extraordinary dance skills.

5. Plaintiff trained diligently for this role for hundreds of hours leading up the day of the performance, at 2:00 p.m. on Sunday, December 12, 2021, which was to be attended by the whole Deerfield community including teachers, families, students, and the public, and was told through the entire fall and as late as one hour before the performance by Whitcomb and others on the Deerfield staff that the role remained hers. Then, Whitcomb abruptly and without cause yanked her from the role 40 minutes before the performance was to start. Worse was the way Whitcomb did so. She caused another staff member to throw open Plaintiff's changing room

curtain while Plaintiff was dressing for the performance, doing so while she was half naked, loudly demanded that Plaintiff exit the dressing room right then where, after Plaintiff pulled up her dance costume to cover her exposed breasts, she was detained by a burly uniformed security guard in the public hallway and was not allowed to move until, approximately 30 minutes later, she was publicly escorted from the auditorium by the uniformed guard like a common criminal and in view of her peers.

6. As detailed below, this cruel and humiliating public treatment of Plaintiff was retaliation for her earlier request to wear a self-designed, custom-made dance costume that, while the same in appearance as the dance uniform provided for her to wear by the Deerfield dance department, fit her more securely and thus made her safer, and to feel more safe, during the rigorous and demanding performance required by her role in *The Nutcracker*. Whitcomb had some days earlier arbitrarily refused to allow her to wear that uniform. Her mother sought a review of that decision by Deerfield's Head of School. In the end Plaintiff was told that she had to wear the school dance uniform and she agreed. Indeed, when her dressing room curtain was flung open to drag her out of her dressing room just before the performance, she was in the process of putting on the school's uniform, not the better one she had designed for herself.

7. There was absolutely no cause to remove Plaintiff from her role in the performance. She was capable and ready to perform and indeed her recent rehearsals had drawn nothing but high praise. As detailed below, the Defendants' treatment of Plaintiff by removing her from her role and doing so in the manner they did was in retaliation for her request to wear a uniform making her safer and to feel more safe; and only because of Whitcomb's completely unjustified anger over Plaintiff's mother's appeal to the school's Head after Whitcomb had refused Plaintiff's request. This conduct was also a breach of Deerfield's contractual obligations to her,

negligence, the wrongful infliction of emotional distress, and false imprisonment for which Plaintiff is entitled to damages in an amount to be proved at trial. Plaintiff also seeks injunctive relief to assure that this outrageous conduct does not recur, and attorney's fees.

## The Parties

8. Plaintiff is domiciled in the state of California.

9. Defendant Whitcomb is domiciled in the Commonwealth of Massachusetts and works in Deerfield, Massachusetts, within this District.

10. Defendant Deerfield Academy is a corporation organized and having its principal place of business in the Commonwealth of Massachusetts and is therefore domiciled in Massachusetts. It is located in Deerfield, Massachusetts, within this District.

## Jurisdiction and Venue

11. Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331 because Count I of this Complaint is a claim arising under the laws of the United States, specifically under the American with Disabilities Act ("ADA") (Title 42 U.S.C. §12182(a)). Alternatively, subject matter jurisdiction exists under 28 U.S.C. §1332(a)(2) (diversity of citizenship) because the Plaintiff (domiciled in California) is a citizen of a different state than are both Defendants (domiciled in Massachusetts), and the amount in controversy exceeds $75,000.00 exclusive of interests and costs, as is more particularly shown below.

12. Venue is proper in this District under 28 U.S.C. §1391(b)(1) because both Defendants reside and are found within this District and, alternatively, venue in this District is proper under 8 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District, at Deerfield, Massachusetts.

**Facts Related to All Counts**

**The Plaintiff**

13. Plaintiff is now 17 years old. She has always been an excellent student. Since a very young age, her love has been dance. Plaintiff began her dance training at the age of six in a small local studio in the East Bay area of northern California, The El Cerrito Ballet Center, which follows a classical ballet training based on the Royal Academy of Dance syllabus. As her love for dance began to grow, she decided to commit to more rigorous instruction. She attended her first ballet intensive study at Berkeley Ballet Theater, a pre-professional dance program in Berkeley, California where she trained under Britt Juleen and Christopher Lam, two well-known dance instructors. In the summer of 2019, when she was just 15 years old, she attended both the Joffrey Ballet Summer Intensive in New York City and Marat Daukayev's summer intensive in Los Angeles.

14. By the time the Plaintiff was considering where to attend high school, Plaintiff was already a highly talented and trained dancer for her age with great promise for a successful lifetime in dance. Her dedication to dance was complete, despite the known damage to a ballet dancer's toes and feet that accompany full-time dance training and performance, and she continued her full-time dedication while sacrificing the enjoyment of other activities normal to an adolescent girl. Her family had also devoted tens of thousands of dollars in the training needed to further her dance proficiency.

15. Despite her academic intelligence and dance progress, Plaintiff was not a normal child. She had what her parents and others believed at the time to be an obsessive compulsiveness, taking extremely long times to accomplish tasks that others completed quickly, insisting that these tasks be done perfectly no matter the time taken to complete them, including

repeating them over and over again until she perceived that they had achieved the perfection compelled her. These included sometimes taking hours to comb and set her hair, clean her room, or finished what were the easiest of homework assignments.

16. Despite these behavioral challenges, Plaintiff was (and remains) academically proficient—a high achieving student. In her first years in school, grades 1 through 8, she excelled academically despite the many hours each week she devoted to dance. By the fall of 2018, Plaintiff was in her eighth-grade year at a well-respected school in California. She was an excellent student with excellent grades, test scores, and academic-testing ability. She thus had earned the academic achievements and had shown the academic promise allowing her to be accepted to many of the finest secondary schools.

17. While able to attend many of the highly regarded private or public high schools in and around California, Plaintiff and her parents considered the potential benefits to be derived from the well-known boarding schools in New England such as Deerfield, which advertises that it is among the "elite secondary schools committed to high standards of scholarship." After generally considering the benefits of these East Coast schools, Plaintiff and her parents decided that, despite the considerable costs of doing so (approximately $75,000 each year), Plaintiff would seek admission into a private high school in New England so that she could pursue the advantages offered by such a school and, most importantly for Plaintiff, seeking admission to those schools having advanced dance programs.

**The Appeal and Promises of Deerfield**

18. After carefully researching many private boarding schools, Plaintiff and her parents chose Deerfield Academy and decided that Plaintiff would attend there as a boarding student, living on campus in a dormitory with other students, and thereby profiting from exposure to

other students from diverse geographic areas and from living communally with such students in a dormitory under the sustained, watchful, and supportive guidance of supervising adults as was promised by Deerfield.

19. The most appealing feature of Deerfield to Plaintiff was its dance program. Featured on Deerfield's website among numerous video portrayals of dance by student and professional dancers, Deerfield tells prospective students about its dance program:

> Deerfield's comprehensive dance program provides training in modern, jazz, ballet, pointe, hip-hop, and contemporary dance techniques as well as instruction in the craft of choreography and improvisation. Classes are tailored to meet the needs of all experience levels from complete beginners to pre-professional dancers. There are opportunities to perform in and choreograph for dance concerts that are presented each of our three terms.
>
> Opportunities within Deerfield's dance program are supplemented by an extensive series of performances and master classes by such outstanding dance companies as Alvin Ailey, Momix, Ballet Chicago and David Parsons. Additionally, each year the works of distinguished guest choreographers are commissioned for dancers in the program. There is also a ballet coaching program that provides private and semi-private instruction for dancers of all experience levels.

20. This description appealed to Plaintiff because of her love for dance.

21. Moreover, because of Plaintiff's behavioral difficulties described above, both Plaintiff and her parents were also attracted Deerfield's assurance in its publications as follows:

> Discrimination is the mistreatment of a person based on actual or perceived characteristics --including disability, or any other classification protected under state or federal law or regulation. Deerfield is committed to an educational environment in which all students are treated with respect and dignity. Accordingly, Deerfield does not tolerate discrimination of any form, and we will act quickly and decisively when such actions are witnessed or brought to our attention. If members of the Deerfield community experience or witness any discrimination by students or employees, they should report the incident to an employee or the Student Life Office. Such incidents violate the ideals of Deerfield and may warrant a disciplinary response.
>
> Deerfield will take appropriate steps to protect from retaliation any person who takes action consistent with this Policy or who reports, files a complaint of, or cooperates in an investigation of a violation of this Policy. Threats or acts of

retaliation . . . are serious offenses that will subject the violator to disciplinary and/or other corrective action. Retaliation is any form of intimidation, reprisal, or harassment by a school community member directed against another school community member for reporting or filing a complaint, for aiding or encouraging the filing of a report or complaint, for cooperating in an investigation under this Policy, or for taking action consistent with this Policy.

22. While Plaintiff and her parents had some concern about Plaintiff going 3,000 miles from their home in the California suburbs to live in a communal dormitory in western Massachusetts at her young age (she was 15 years old), Plaintiff decided to enroll in Deerfield in reliance on both the compelling description of its dance program and the above stated promises about protecting those students with disabilities.

23. Plaintiff thus enrolled at Deerfield and commenced attendance there at the beginning of the academic year 2019/2020.

**Plaintiff's First Two Years at Deerfield**

24. During her first two years Plaintiff excelled academically, despite Covid and the disruptions it brought and despite some behavioral traits described above that, as time went by at Deerfield, became aggravated.

25. Deerfield noticed her behavioral issue, her excess time to finish tasks, her insistence on perfection despite the delays it caused, a developing lack of focus, and an apparent anxiety. Ultimately, she was seen by a psychiatrist to whom she was referred by Deerfield and she was diagnosed with General Anxiety Disorder. Specifically, the doctor diagnosed her as follows:

> The evaluation results reveal a compelling picture of anxiety. [Plaintiff] appears to be subject to anxiety that is generalized in some respects, but which is also prone to becoming exacerbated and more acute in performance-based situations. The latter may be influenced by a somewhat perfectionist orientation, concern about negative appraisals from others, and a personality style weighted toward conscientiousness, responsibility, and maturity. The results of this evaluation support a diagnosis of (DSM-5 code 300.02) Generalized Anxiety Disorder.

***Recommended Accommodations***

> It is recommended that [Plaintiff] be allowed to have additional time (+50%) on classroom tests and quizzes as well as during standardized testing. While it is difficult to replicate the kind of anxiety in a school or standardized testing situation during an evaluation such as this (and thus scores on measures of academic fluency, for example, may not be especially discrepant from ability scores), [Plaintiff's] history of difficulty completing exams is compelling, and the psychological profile is one that is consistent with generalized anxiety becoming exacerbated in performance-based situations.

This performance anxiety was also quite clearly an issue when she prepared for a dance recital, as will be shown below.

26. Despite this disorder, Plaintiff also continued her high academic performance and continued to develop and improve her dance to a higher level. She spent many hundreds of hours devoted to dance on campus during school and devoted even more time over her summer breaks. During the summer of 2020, after her freshman year, she attended Kaatsbaan's Ballet Intensive, where she took dance classes under Lorin Mathis, Lisa Lockwood, and Stella Abrera.

27. At the end of her sophomore year at Deerfield and because of the skill and dedication she had demonstrated to the Dance department, Plaintiff was informed that she had been awarded the coveted role in the Deerfield Christmas dance presentation. She was to perform the lead role in Tchaikovsky's famous ballet, *The Nutcracker*, as the Sugar Plum Fairy, including the complex and challenging "Dance of the Sugarplum Fairy." The performance was to be presented at the Christmas performance in the main auditorium in Deerfield's Center for the Performing Arts in Deerfield's highly popular, annual Holiday performance open to the public.

28. Plaintiff was thrilled to have earned the role. Because of its technically challenging requirements, Plaintiff planned to record her performance by video and use that video as part of her application to colleges because she planned to apply to colleges offering the most advanced dance programs so that, while obtaining a college education, she could advance ger dance career,

still (and indeed more than ever) her life-long dream. Deerfield well knew Plaintiff's plans.

29. Over the course of that summer before her junior year when she would perform the as the Sugar Plum Fairy, she devoted all her time to readying herself. She spent the time and resources to attend the four-week, intensive advanced dance program at the City Ballet in San Francisco where she trained in the pre-professional dance program under Marianna Lobanova. She also traveled to Zurich, Switzerland to attend Art of Zürich Ballet where she attended master classes given by highly regarded dance instructors Craig Davidson, Eva Dewaele, and Elena Vostrotina.

30. Most importantly that summer, Plaintiff participated in extensive private lessons in San Francisco to train for specifically for the "Dance of the Sugar Plum Fairy." All her efforts that summer were communicated to Deerfield's dance department, through Defendant Whitcomb who thus well knew about the effort and dedication Plaintiff had invested in the performance, and knew of its importance to her.

31. When she returned to Deerfield in the fall of her junior year, for the academic year 2021/2022, she devoted all her time apart from her studies preparing for her starring role. Her devotion paid off. As Whitcomb, the head of Deerfield's dance department, wrote to Plaintiff in November 2019, after watching Plaintiff perform the dance, "you were and are breathtaking and compelling in that role." Indeed, all who saw her practice performances were literally awed by her skill and perfection.

32. As part of her preparation and determination to do her best, she decided that she could create, by designing and custom making, a dance uniform for the role that would suit her better because it would fit her body perfectly, since it was created for her exact shape. Such a handcrafted uniform would give her more physical support for the arduous physical demands of

the long, technically complicated, and physically challenging dance role. When completed, her dance uniform was indistinguishable in appearance from the stock uniform provided by the Deerfield dance department. However, it fit her more snugly, was lighter in weight but of stronger material, and thus supported her much better physically. It thus gave her confidence that while performing the dance, she would not fall or otherwise physically fail. Given her recognized performance anxiety, this was very important to her emotional wellbeing as the performance neared, as her practices intensified as the public excitement intensified as the performance drew near.

33. It is emphasized here that, as Deerfield and Whitcomb well knew, this performance of *The Nutcracker* was not just a dance recital to Plaintiff. It was the honor of Plaintiff's life to that point, something that she had trained for relentlessly, sacrificing all other activities, was the culmination of her dreams, and a performance that she planned to video for use as a demonstration of her worthiness to be accepted into the finest dance programs offered at the best colleges and universities. Her entire emotional wellbeing was vested in this performance. Indeed, it had such importance to her that her mother came to view the performance from California and her older brother came from Maryland, where he was attending college.

34. However, without any remotely good reason, Whitcomb informed Plaintiff that she was forbidden from wearing the uniform she had designed, but instead was required to wear the ill-fitting and structurally inferior uniform offered by the school. This concerned Plaintiff greatly. She feared for her safety without the uniform she had made, and she feared that her performance would somehow fail or be deficient, and thus not be the accomplishment for which she had trained and devoted so much of her youth readying herself to execute. She feared that she would have lost the perfect opportunity to showcase her talent and diligent preparation to the colleges

and universities to which she wanted to apply, the ones with the best dance programs. Given the better structure and fit of her self-made uniform, these fears were grounded in fact. Moreover, the uniform she made was truly needed to quell the anxiety that was part of her disability. Whitcomb's decision forbidding Plaintiff's hand tailored uniform was arbitrary; indeed, other students had done so in the past.

35. As a result of Whitcomb's refusal, her mother discussed the matter with Deerfield's Head of School attempting to appeal Whitcomb's refusal. Plaintiff's mother emphasized that not only was the hand-tailored uniform better for safety purposes, but it was also truly an accommodation to Plaintiff's General Anxiety Disorder with its recognized symptom of heightened anxiety. Plaintiff's mother particularly stressed that Plaintiff's psychiatrist, to whom she had been referred by Deerfield, emphasized that Plaintiff's "generalized anxiety became 'exacerbated in performance-based situations.'" The self-tailored dance uniform was a modest accommodation, reasonable in all respects, could be afforded at absolutely no cost to the school, and would create no disruption of the mission of the dance department.

36. Discussions were held back and forth between the Head of School, Associate Head of School and Dean of Faculty, Plaintiff's mother, and the Dance department, including Whitcomb. In the end Plaintiff was told that the only way she could perform was to wear the uniform provided by Deerfield. Sadly, but determined to be true to her long-held dream and its promise for her future, Plaintiff agreed to wear that inferior uniform.

37. On the day of the public performance, the Hess Center auditorium was filling up with an excited audience. Plaintiff's peers arrived to see her as her prominent role had been advertised in Deerfield's school newspaper, where she had been interviewed about the challenges of her upcoming performance. Plaintiff's family had traveled to Deerfield to watch. Plaintiff herself

arrived at the Hess Center auditorium where she was met by a staff member and showed to a private dressing area off stage where she closed herself in for privacy, undressed and began putting on the uniform the staff member had supplied her, the school's uniform, not the one she had requested to wear.

38. As she was dressing, another staff member abruptly appeared, yanked open the privacy curtain, exposing Plaintiff who was still in the process of dressing and was naked from the waste up with her breasts fully exposed. The staff member demanded that Plaintiff immediately leave the dressing room and come to the public hallway just outside that room. There she was met by a large and uniformed security guard who told her not to move. Whitcomb then came and started screaming at her, but Plaintiff was in such shock that all she remembers is the screaming, not what Whitcomb screamed at her. The guard refused to allow her to move for approximately 30 minutes. During this time people were steaming past her into the Auditorium and stopped to inquire of Plaintiff what was going on and she had to tell them that she would not be performing.

39. After this humiliating experience, Deerfield increased the humiliation: it had the security guard publicly escort this vulnerable and emotionally crushed 17-year-old from the Hess Center like she was a common criminal out into the cold, kicking her out of the place where she had spent hundreds of hours preparing for the most important moment of her life, a moment into which she had invested her emotions, her esteem, and her dreams for the future, all of which Deerfield and Whitcomb well knew.

40. Immediately thereafter, Plaintiff went into a deep depression and became dysfunctional. She suffered and still suffers Post Traumatic Stress Disorder ("PTSD") directly caused by Whitcomb's cruel conduct described above.

41. It was hoped that the intervening Holiday break during late-December and early-January 2022 would improve Plaintiff's condition, but it did not. When she returned to the Deerfield in January 2022, she remained badly depressed to the point of not being able to function as student. She continued to suffer PTSD. She has had to withdraw for two trimesters—the remainder of her junior year—as medical leave from the school with her condition being so bad that Deerfield medical professionals agreed that this medical leave was necessary for her to try to recover.

## COUNT ONE
### (Breach of Contract)

42. Plaintiff realleges and incorporates by reference herein the allegations continued in paragraphs 1–41 hereof.

43. The promises and representations made by Deerfield about protecting disabled students were contractual obligations. They created the reasonable expectation in Plaintiff that Plaintiff would be protected from any discrimination by reason of her disability and would not be subjected to any retaliation because of her requests for a reasonable accommodation.

44. In treating Plaintiff in the manner described above, and in failing to provide the support, guidance, and assistance promised, instead treating Plaintiff in the harsh, mean-spirited, bullying, and completely unsupportive and demeaning way in they did, Deerfield, acting through its employee Whitcomb and others, breached its contractual obligations to Plaintiff.

45. Plaintiff has been damaged by said breach in an amount to be proved at trial, including a loss of all the tuition they paid during the academic year involved, the loss of all the training paid for to ready Plaintiff for her dance, medical expenses other expenses incurred, and

other loss and damage in an amount to be proved at trial, but which amounts to at least $250,000 in such out-of-pocket expenses.

## COUNT TWO
### (Negligent Infliction of Emotional Distress)

46. Plaintiff realleges and incorporates by reference herein the allegations contained in paragraphs 1–45 hereof.

47. In acting towards Plaintiff in the manner described in this complaint, Whitcomb acted below the standard of care of an employee having a duty to act reasonably towards a person under her charge, such as Plaintiff (and indeed as promised), and Whitcomb acted unreasonably and negligently, causing the negligent infliction of emotional distress to Plaintiff. Whitcomb, as someone entrusted with the care for and authority over Plaintiff, had a duty of due care toward Plaintiff to exercise reasonable treatment of Plaintiff so as not to harm Plaintiff. It was foreseeable to Whitcomb that her actions, and the actions that she caused others to take against and towards Plaintiff, would severely harm Plaintiff. Those actions were, in fact, the proximate cause of the substantial harm suffered by Plaintiff, from which she continues to suffer.

48. Specifically, by the actions alleged above, Whitcomb, acting on behalf of Deerfield, either intended to inflict emotional distress on Plaintiff, or knew, or should have known, that emotional distress was the likely result of her conduct, and her conduct and those acting to assist her in the ill treatment of Plaintiff as described above, was extreme and outrageous, outside the bounds of decency, and utterly intolerable in a civilized society. This conduct has caused Plaintiff severe emotional distress which still endures as of the date hereof, with no end in sight.

49. Plaintiff has suffered injury to person and her emotional well-being and thus has been damaged by this conduct in an amount to be proved at trial but in an amount at least as much as $250,000.

## COUNT THREE
### (Negligent Retention of Whitcomb)

50. Plaintiff realleges and incorporates by reference herein the allegations contained in paragraphs 1–49 hereof.

51. When Deerfield accepted Plaintiff as a fifteen year-old boarding student, accepted the substantial tuition payments from her mother, described the care and safety responsibilities it was undertaking for Plaintiff, and represented expressly and impliedly that it would undertake its responsibilities towards Plaintiff exercising ordinary care, both Deerfield and its employees and agents assumed a position of trust over Plaintiff, as well as the duty to exercise that trust by using ordinary care in its treatment of her.

52. Deerfield, and its employees and agents, breached their duty to exercise ordinary care in relation to Plaintiff because Whitcomb, while acting within the scope of her duties and authority conferred by Deerfield, mistreated Plaintiff in the manner described above, acted in a hostile and demeaning way toward Plaintiff, and knowingly and cruelly ruined the opportunity that Plaintiff had so long trained and sacrificed for and did so in a way that no adult who had assumed supervision and control over a teenager, much less a school dance director specifically assigned by Deerfield to exercise supervision and control over Plaintiff, would engage in.

53. Whitcomb was, long before she acted in such a wrongful manner to Plaintiff, well known at Deerfield for acting in such a mean, cruel and harmful way to other students, so much so that students and staff called her "BITCHCOMB." Deerfield therefore knew of Whitcomb's cruel behavior towards students and, despite that knowledge, negligently retained Whitcomb in a position of authority as the Dance Director, where she was able to harm Plaintiff; they specifically allowed Whitcomb to remove Plaintiff from the performance, berate and scream at her in front of her peers, and humiliate her, all in the manner described above.

54. Deerfield had a duty to Plaintiff to provide reasonable care and treatment of her and towards her while she was in their custody at Deerfield. That duty required Deerfield not to subject a vulnerable and emotionally fragile young Plaintiff to such a cruel person as Whitcomb was known to be. It was foreseeable that subjecting Plaintiff to the mean and cruel Whitcomb and allowing Whitcomb to determine important matters for Plaintiff could cause harm to Plaintiff, as it did.

55. Deerfield was negligent in subjecting Plaintiff to the supervision and control of Whitcomb, and Deerfield negligently supervised Whitcomb as dance director, allowing her to act in the wrongful and harmful manner described above.

56. The negligence of Deerfield described above proximately caused substantial injury to Plaintiff in an amount to be proved at trial but an amount at least as much as $250,000.

## COUNT FOUR
### (Injunctive Relief under the ADA)

57. Plaintiff realleges and incorporates by reference herein the allegations contained in paragraphs 1–56 hereof.

58. General Anxiety Disorder is a disability under the Americans with Disabilities Act because those persons afflicted by it are as a result substantially limited in one or more major life activities, including "learning," "reading," "concentrating," "performing manual tasks," and "bending." All of those are specifically included by name within major life activities enumerated under the ADA, Title 42 U.S.C. § 12102(2)(A).

59. Plaintiff's request to Whitcomb that she be allowed to wear her hand-made uniform on the night of the performance was a request for an accommodation to Plaintiff's disability for the reasons stated above. When Whitcomb refused those requests for no valid reason, Plaintiff's request, through her mother, to the Head of School that he override the refusal of Whitcomb to

allow Plaintiff to wear the hand-tailored uniform during the performance was also a request for a reasonable accommodation to Plaintiff's disability.

60. The actions by Whitcomb and Deerfield cruelly refusing to allow Plaintiff to participate in the performance, and humiliating her in the manner described above, in addition to failing to make a reasonable accommodation for her disability in violation of the ADA provisions prohibiting such conduct, have also violated additional provisions of the ADA—specifically Title 42 U.S.C. § 12203(a) and (2). These sections of the ADA prohibit retaliation against Plaintiff for having requested an accommodation, and were violated when Whitcomb and Deerfield intimidated Plaintiff for having sought an accommodation and interfered with Plaintiff's exercise or enjoyment of her rights to seek an accommodation.

61. Plaintiff hopes that she can regain her wellbeing from the wrongful conduct of Whitcomb and Deerfield and return to Deerfield. When she does Deerfield should be enjoined to allow her reasonable accommodations within the meaning of the ADA and should be enjoined from in any way retaliating against her if she seeks such accommodations for her disability.

## PRAYER FOR RELIEF

By reason of the forgoing, Plaintiff demands relief as follows:

I. For compensatory damages in an amount to be proved at trial;

II. For an injunction ordering Deerfield to comply with and afford future reasonable accommodations requested by Plaintiff when she returns to Deerfield and to refrain from any retaliation against her if she seeks a reasonable accommodation;

III. For reasonable attorneys' fees and all taxable costs incurred in this action; and

IV. For such other and further relief as the Court deems just.

**JURY DEMAND**

Pursuant to Rule 38(b), F.R. C. P., plaintiff demands a jury trial on all issues so triable.

Dated: March 8, 2022					RESPECTFULLY SUBMITTED,

						MARKHAM READ & ZERNER
						*/s/ John J.E. Markham, II*
						John J.E. Markham, II
						(Mass. BBO No. 638579)
						One Commercial Wharf West
						Boston, Massachusetts 02110
						Tel: (617) 523-6329
						Fax: (617) 742-8604
						Email: jmarkham@markhamreadzerner.com